IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL DIVISION

– – – – – – – – – – – – – – – – – – – – – – – – – – – – x

LESLIE WILSON,                                  :

                Plaintiff,    :

          v.                              :          NO. 02-CV-4662

PPL ELECTRIC UTILITIES CORPORATION,    :

             Defendant.  :

                              :

– – – – – – – – – – – – – – – – – – – – – – – – – – – – x

## DECLARATION OF RONALD PEZON

Ronald Pezon declares pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am presently employed as a systems engineer for defendant PPL.  From late 1997 through July 2002, I held the position of Regional Service Supervisor for the Lehigh Region, and was plaintiff Leslie Wilson's supervisor until his termination in September 2000.  I make this declaration in support of Defendant's motion for summary judgment.

**Wilson's Job Duties**

2.      As the Regional Service Supervisor, I was responsible for ensuring that PPL's customers in the Lehigh Region had electrical service installed in a timely and satisfactory manner, and for selling PPL products and services to the customers in my region.  I supervised four individuals (three individuals holding the position of Service Consultant and one holding the

position of Service Engineer) who were responsible for coordinating the installation of electrical service to PPL's customers, and for selling other PPL products.

3.    When I became the Regional Service Supervisor, Les Wilson, Bob Stano and Dave Weidman were already employed as Services Consultants in the Lehigh Region. Wilson, Stano and Weidman performed the same job duties, but for different geographic areas within the region. The fourth employee that I supervised, Dave Anderson, was the Service Engineer and was responsible for servicing all customers in the region who had higher voltage requirements.

4.    The Service Consultants were responsible for the coordination for electrical service to residential and commercial customers, and were often the first PPL employee that a customer spoke with about obtaining electrical services. The duties of the Service Consultant included obtaining paperwork and information from the customer about his or her service requirements (*e.g.*, work plans, electrical loads, service date requirements, etc.), and providing that information to the Regional engineering group which designed and planned the electrical service to meet the customer's requirements. The Service Consultant was, in essence, a project manager responsible for coordinating the many different tasks that were required before PPL could provide electrical service to customers. The Service Consultant also was expected to expand PPL's business by selling new products and services to customers.

5.    Because Service Consultants were expected to meet with customers, much of their work day was often spent out of the office meeting with customers or potential customers regarding projects in their assigned geographical area.

2

## Complaints Regarding Wilson's Performance

6.    In 1998, which was my first full year as Regional Service Supervisor, I began receiving significant complaints from both customers and other PPL employees concerning Wilson's work performance.   In 1998, John Faisetty, who was the Area Engineering Supervisor for the Lehigh Region, handed to me a list of developments that Wilson was not properly managing that resulted in complaints from customers.

7.    In September 1998, Ira Lehrich, a developer and significant PPL customer, sent letters to me and William Hecht, the Chief Executive Officer of PPL, complaining about Wilson's performance.  Lehrich claimed that Wilson did not return his phone calls, and, as a result "of an inept employee of PP&L," his project was delayed three months.  In his letter to William Hecht, Lehrich stated that the problem caused by Wilson failing to manage his project "could put me out of the building business."  Lehrich's complaint was the most serious customer complaint I had received during my 21 year career with PPL, and it was the first (and only) time that I am aware of that a customer complained directly to PPL's CEO.  (Copies of the letters that Lehrich sent to me and William Hecht are annexed hereto as Exhibit A.)

8.    Despite my substantial efforts to coach and counsel Wilson to improve his performance (which I describe below), Wilson's performance problems continued in 1999 and 2000.  In 1999, Ken Hartman, who replaced John Faisetty as the Area Engineering Supervisor for Lehigh, complained to me that Wilson was not providing the Distribution Technicians in his group with the information they required to engineer the projects.  Hartman complained that his Distribution Technicians, including Carole Tarr and Neil Bouc, were forced to perform Wilson's job duties, including meeting with and obtaining information from the developers directly, because of Wilson's neglect of his job duties.

3

9.    Also in 1999, Wilson failed to properly manage a project for one of PPL's largest customers, Liberty Property Trust.   The local manager for Liberty Property Trust called my supervisor, Dave Ling, to complain that Wilson would not return phone calls and was not responsive to their requests.  Wilson also failed to promptly notify Liberty Property Trust that there would be a delay in the installation of its service, which the customer learned from another PPL employee.  PPL had to provide the customer with a temporary generator at a substantial cost to the Company as a result of the mismanagement of this project.

**Wilson's Customer Satisfaction Surveys**

10.    In order to determine how well the Service Consultants were satisfying customers, the Service Consultants were asked to identify the customers that they worked with so that a customer satisfaction survey could be sent to them.   In 1998, a large number of surveys that were sent to customers identified by Wilson were returned to us without being completed because of a wrong address or customer name, or with a notation from the customer claiming that they did not work with Wilson.   As a result, I became suspicious that Wilson was not meeting with the customers on his work schedule, but gave him the benefit of the doubt and attempted to work with him to correct the problem.

11.    In both January and June 1999, in order to help Wilson improve his survey responses, I instructed Wilson that surveys only should be sent to individuals at the customer who Wilson worked with directly.  (Copies of e-mails I sent to Wilson regarding the surveys are annexed hereto as Exhibit B.)  Notwithstanding my efforts to improve his performance, two of Wilson's customers (Meadow Valley Electric, Inc. and Dagostino Company, Inc.) returned surveys in January 2000 and March 2000, respectively, indicating that they had no dealings with

4

Wilson on their projects. (Copies of the satisfaction surveys returned by those customers are annexed hereto as Exhibit C.)

12.    In addition, surveys were returned from several of Wilson's customers that were highly critical of his performance. For example, one developer indicated in a survey that he was completely dissatisfied with Wilson, and wrote that "I want to know that the person I'm dealing with cares about my problems and needs and is willing to work with me. That was not my experience with Les Wilson. His 'could care less' attitude was offensive and unacceptable, and when combined with his inexperience, lack of knowledge, and complete lack of a sense of urgency and timeliness led to an unacceptable experience." (A copy of the survey is annexed hereto as Exhibit D.)

13.    Wilson was the only employee in my group that I received significant complaints from customers and other PPL employees regarding job performance. I did not receive any complaints from developers or other PPL employees that Bob Stano, Dave Anderson and Dave Weidman were failing to perform their job duties, nor did I receive back customer satisfaction surveys from their customers in which the customer denied working with them.

**Efforts To Coach And Counsel Wilson**

14.    Between 1998 and the date of his termination, I personally spent a significant amount of time coaching Wilson in an attempt to improve his performance. However, improvements in Wilson's performance were always temporary, with Wilson improving his performance for a short period of time before reverting back to his unacceptable behavior.

15.    In September 1998, after receiving the complaint from Ira Lehrich, I met with Wilson to develop a plan to improve his performance. Because I believed that Wilson was

5

having difficulty managing his work, I asked him to provide me with a weekly plan that described the meetings and appointments he had scheduled for the following week, as well as a description of the major objectives he sought to achieve.  By doing this, I believed that Wilson would be more organized and better able to focus on the tasks that he needed to complete. (Attached as Exhibit E is an e-mail I sent to Wilson on September 23, 1998 memorializing our discussion about ways to improve his performance.)

16.    I also worked with Wilson to help him improve his efficiency.  Wilson's mileage was one of the highest in PPL despite the fact that his territory was not that large.  From reviewing his schedules, I noticed that Wilson frequently traveled to the Buxmont Service Center (which was part of his territory), but typically scheduled only one or two appointments for each visit to Buxmont.  In April 1999, in order to improve Wilson's efficiency, and based on my discussions with him concerning his workload, I told him to travel to Buxmont one day per week and schedule all of his Buxmont appointments on that day.  (A copy of an e-mail memorializing our discussion is annexed hereto as Exhibit F.)

17.    Despite Wilson's agreement in April that he would travel to Buxmont only one day per week (Wednesday), I discovered in September 1999 when reviewing Wilson's August expense report that he purportedly traveled to Buxmont almost *every* day of the week in August 1999.  Moreover, despite the fact that Wilson was claiming in his August expense report that he traveled to Buxmont virtually every day of the week during that month, I was still receiving complaints from Murray Garber, the Area Engineering Supervisor for Buxmont, that Wilson was never around and customers were not being serviced.

18.    In September 1999, I spoke to my work group about reducing their mileage, and instructed Wilson, Anderson, Stano and Weidman that they should plan their work

6

in a manner to keep their mileage under 750 miles per month. (A copy of the e-mail I sent to the group is annexed hereto as Exhibit G.) Wilson protested that change, and requested that he be allowed to use a Company car rather than his personal car to travel on PPL business. I explained to Wilson that it was not economical for the Company to provide him with a car, and, moreover, providing him with a Company car would not address my primary concern – that he was spending too much time driving and not enough time servicing customers and selling products. Despite my instruction that he substantially curtail his mileage, Wilson did not consistently maintain his mileage below 750 miles per month. (For example, in June 2000, Wilson claimed reimbursement for 1,220 miles in his expense report.)

        19.    In 1999, I also attempted to coach Wilson, who had the worst sales results in my group, on ways to increase his sales of PPL products. Based on his time records in 1999, I believed that Wilson was not spending sufficient time developing sales proposals and closing sales, which I discussed with him in his 1999 performance appraisal. In 2000, I received a complaint from a PPL manager with overall responsibility for sales that Wilson charged more time to the sales code in PPL's time reporting system during that year than any other PPL employee, yet he had the lowest sales results in the Company (which impacted the profitability of this manager's department). I did not understand how Wilson allegedly could be devoting so much time to sales when I never saw any sales proposals from him or tangible evidence that he was attempting to sell products.

**The Decision to Investigate Wilson**

        20.    By the spring of 2000, I was frustrated with Wilson, and very suspicious that he was not engaging in the work related activities that he claimed to be doing in his weekly work plans and expense reports. Wilson continued to charge a high number of miles on his

expense report, yet customers and other PPL employees complained that he was not servicing his accounts, and we continued to receive customer satisfaction surveys in which Wilson's customers claimed that they did not deal with him on projects.

21.     In early 2000, I began reporting to Al Cassaday who replaced Dave Ling as my supervisor.  After Cassaday, who was the Regional Manger for Lehigh, assumed responsibility for my group, we met to review the group's performance.  During this meeting, I explained to Cassaday all the efforts I made to help Wilson improve his performance over the last two years, but to no avail.  I also expressed my concern that Wilson was not accurately representing his work activities to me because, despite the high number of miles he claimed to have driven to attend customer meetings each month, both customers and PPL employees complained that he was not performing his job duties or was not accessible.  Cassaday suggested that PPL's Security Services Department conduct an investigation of Wilson to determine whether he was conducting non-Company business on Company time, and I agreed with the recommendation.

22.     Thereafter, I prepared a written request to commence an investigation of Wilson that detailed the reasons for the investigation, and sent the request to Cassaday for his signature.  (A copy of that request is annexed hereto as Exhibit H.)  Other than providing information to the PPL investigators when requested to do so, I had no involvement in the investigation conducted by Security Services, and was not shown the investigation report or provided information relating to the investigation.

**Wilson's Failure To Provide A Medical Note**

23.     On Monday August 14, 2000, Wilson was the designated "on call" Service Consultant, who was responsible for handling customer calls if another Service Consultant was

not available. Wilson, however, did not arrive at work that morning, and failed to notify me in advance that he would be absent. Wilson called in later that day to say that he was at a doctor's appointment, and that he would report to work in the afternoon. When Wilson finally arrived at work in the late afternoon, he was interviewed by representatives of the Security Services Department as part of a pre-scheduled interview relating to their investigation of Wilson's work activities that was originally scheduled earlier that day.

24.     On August 15, Wilson requested that his absence on August 14, for payroll purposes, be treated as sick time, rather than as time off for a doctor's appointment. After consulting with Jan Thomas, a human resources representative responsible for my area, I requested that Wilson provide me with a doctor's note to substantiate his claim of illness on August 14, but he refused my request. I notified Jan Thomas and Al Cassaday regarding Wilson's refusal to provide me with a doctor's note.

25.     On August 16, 2000, I, Al Cassaday, and Jan Thomas met with Wilson to discuss his refusal to provide a medical note to substantiate his claim of illness on August 14, 2000. After Wilson told Thomas that he would not provide a medical note to substantiate his absence, Thomas informed Wilson that he was suspended for insubordination until he agreed to provide the doctor's note.

**The Decision To Terminate Wilson's Employment**

26.     Wilson's employment was terminated by PPL in September 2000 based on the results of the investigation that was conducted by Security Services. I did not receive a copy of the investigation report, and was not involved in the decision to terminate Wilson's employment, which was made by Al Cassaday and his supervisor Robert Geneczko.

9

of the investigation report, and was not involved in the decision to terminate Wilson's

employment, which was made by Al Cassaday and his supervisor Robert Geneczko.


I declare under the penalty of perjury that the foregoing is true and correct.

Dated: August _1 3_ , 2003

_____
Ronald Pezon

# REQUEST FOR APPROVAL TO SECURE ASSISTANCE OF AUDITING OR HUMAN RESOURCE AND DEVELOPMENT IN CONDUCTING AN INVESTIGATION

| Name of Employee(s) or Incidents to be Investigated: |
| :--- |
| Leslie E. Wilson |

| Title: | Business Unit: *(previously called Department)* |
| :--- | :--- |
| Service Consultant-Field Svc Ops. | Power Delivery |

| Date(s) of Incident(s): |
| :--- |
| 1998/1999/2000 |

Description of Incident(s):

*Numerous developers have complained about Les not getting back to them, or not knowing that he was in charge of coordination for their project.
*There are presently about 15 developments needing/not getting his attention.
*Technicians have been observed doing Les's job of development coordination.
*In mid 1999 Les had driven over 15,000 miles (12 months) on company business.
*Time was scheduled to go out with Les on customer calls. His calls were cancelled at the last minute or they were never really scheduled.
*Numerous customer satisfaction surveys were returned -"bad addresses/names".
*Satisfaction surveys were returned, or called back - "never worked with Les".
*Used "virtual office" phone for personal calls to Phila.,re-paid PPL monthly.
*Les signs out to Buxmont SC for work, local AES does not always observe same.
*Phone conversations/Church business during normal work hours.
*Letter to Mr. William Hecht 9/10/98 complaint - not getting response from Les.

General Description of Concerns and Nature of Alleged Violation:

Over the years of observation and working to help Les, he has not been able, for some reason(s) to complete his work over extended periods of time and to be an effective Service Consultant.   Without constant reminders about timeliness on important sales and service duties from his supervisor, he has been unable to effectively manage his workload on his own.  He appears to be signed out of the office, but I am suspect that he may not always be meeting with the people or companies he says.  From expense account records, he often drives to one appointment in a given work area and spends a great deal of time there.  The work described/scheduled on "calander", appears to be trivial and of short duration.  Les appears to be using company time for other purposes since he does not seem to be putting in the time and job-coordination efforts required of him to adequately meet his PPL Company and customer obligations.  What does he do with his time, mileage, e-mail, phone, virtual phone, cellular phone?

Manager Requesting Investigation:

*Allen C. Cassaday*

| Signature: *Allen C. Cassaday* | Business Unit: *(previously called Department)* Power Delivery | Date: 5/9/00 |
| :--- | :--- | :--- |

APPROVED

*Robert M. Genegho*
Business Unit Vice President or General Manager

5/11/00
Date

EXHIBIT

*Rohrer 2*
7/18/03    EK



# IRA LEHRICH CONSTRUCTION CO., INC.

3353 TOLCHESTER LANDING
MACUNGIE, PA  18062
PH. 215-395-7113

CUSTOM BUILDERS

September 4, 1998

new telephone number 967-4211

Mr. Ronald Pezon
PP & L
827 Hausman Road
Allentown PA 18104

Dear Mr. Pezon,

I spoke to you a few days ago about a frustrating encounter with an employee of PP & L. At this time I'd like to document what has transpired and state my time factor problem.

On June 8, 1998 I contacted PP & L about doing work for Phases 2 and 3 of my Watermill development. I was informed I had to go through Leslie E. Wilson. On or about that date, I spoke to Mr. Wilson on the telephone. On June 10 I wrote Mr. Wilson a follow-up letter. A copy is enclosed. On July 22 I called Mr. Wilson's number 774-3795 which is Mr. Wilson's voice mail and left a message for him to return my call. He did not return my phone call. On August 5, I called the same number and left a message that I wanted to pick up the engineering plans. He never returned my phone call. On September 1, I called. He didn't return my phone call.

I've been in business for over 30 years. It's most unusual when phone calls are not returned.

I then called Neil Buck who had previously done work for me on Phase 1. He indicated you were his supervisor and I should contact you. Within the past few days, getting to speak to Mr. Wilson has been very difficult. Finally I spoke to him at another phone number 774-3815 and a page 610-281-2321. The page wasn't working because I wasn't informed that I had to dial 610. In my conversations with PP & L everyone has been very cordial and business-like. This was not the case with Mr. Wilson today. He was curt and snappy.

Mr. Wilson informed me that I would have drawings by November 1. Three months have been lost before engineering has started because of an inept employee of PP & L.

EXHIBIT

Wilson 1
4/28/03    TB

For me to deliver a house in Lower Macungie Township, the Township
requires that the development have curb, sidewalk, and a macadam
road. I have scheduled my paving contractor, R.S. Snyder, to pave
towards the end of November which sets a deadline for the stone
grading on the road bed by November 15. Time is a critical factor.
On cold weather days, below freezing, paving is not allowed. All
macadam plants close around December 10-15.

Prior to November 15, all the electric trenches must be dug and
the street crossings for the electric, telephone, and cable
completed.

In conjunction for the trenching for electric, phone, and cable,
UGI trenching in a separate trench must be completed. This is
generally done after PP & L has finished.

For me to complete the development in an orderly fashion, I plan
to start trenching for electric September 21. At that time I'll
need the drawings from PP & L.

If you're unable to meet this schedule we're going to have a major
problem.

I would appreciate hearing from you so this problem can be
resolved amicably.

Very truly yours,

Ira Lehrich

cc: John F. Faisetty
    Engineering Supervisor

6103746283  PA POWER & LIGHT CO                    209 P03/05 SEP 17 '98  15:46

618-774-3334  PP&L                                 117 P02/05 SEP 16 '99  15:43

EXHIBIT
*Wilson 2*
4/28/03    7D

# IRA LEHRICH CONSTRUCTION CO., INC.



3363 TOLCHESTER LANDING
MACUNGIE, PA  18062
PH. 215-966-7113

CUSTOM BUILDERS

September 10, 1998          new telephone    # 610-967-4211
                                fax          610-965-9727

Mr. William Hecht
President, PP & L
2 North 9 Street
Allentown PA 18101

Dear  Mr. Hecht,

I am a conscientious builder/developer and have been in the building business for
30 years. I believe you know my brother, Dr.Henry Lehrich.  We are similar in
our work ethic.

A problem has transpired with PP & L recently. The problem will effect me
drastically, and could put me out of the building business.

I am enclosing copies of letters I wrote to Les Wilson on June 12, 1998  and
Ronald Pezon. The letters are self-explanatory. Today I  spoke to John Faisetty
and he informed me I will have to wait 6 weeks for the  PP & L  engineering
plan making it virtually impossible for me to pave the roads this year.

If the time span could be reduced it would be greatly appreciated.

Very truly yours,

Ira Lehrich

RECEIVED
SEP 1 4 1998
CAROL WILSON
OFFICE

63-15-1998 14:50    6103746283    PP&L    p.01

**Pezon, Ronald W.**

| | |
|---|---|
| From: | Pezon, Ronald W. |
| Sent: | Wednesday, January 06, 1999 09:32 AM |
| To: | Wilson, Leslie E. |
| Subject: | Your Returned Surveys, TO DO's by 1/13/99 |

Recipient Type: BCC

-------
I would like to help you improve your satisfaction survey return rate and satisfaction ratings. Below are my requirements that we've spoke about and some ideas that may help you. Please think about this for a few days and see me about your plan to make improvements.

TO DO 1)   Please return those "returned surveys" with a proper name and address to Jen for mailing or return them to me with an explanation of what you did, or are going to do about them.

I expect that you are working with "real people" at real addresses on the service jobs you coordinate on your list. Getting so many surveys returned last year makes me suspect of your "meetings". It is not your job to drive around to check status. Technicians and Multi-crew Foremen know much about the jobs, please call them or customers or electricians first to check "status".

If this was your company to run profitably would you spend $30 of your own money to drive to and check one job in Buxmont area or would you call someone like the customer, electrician, or technician? Please seriously think about that. We are trying to run a leaner/smarter business in 1999 and as you know we have stringent goals to meet as a team.

Follow this and it will help you:
TO DO 2)   Put your CONTACT NAME, CUSTOMER NAME and your CALL PURPOSE on Schedule Plus. Use schedule plus as your time planner/manager. I will be watching it carefully.

Please meet with customers at customer's place of business for a specific purpose. You should document your meetings and purposes completely in Schedule Plus. This should help you get better survey returns and satisfaction.

Please see me by next Wednesday 1/13/99 with your plan in the area of customer satisfaction.

EXHIBIT
*Wilson 10*

1

**Pezon, Ronald W.**

| | |
|---|---|
| **From:** | Pezon, Ronald W. [Ronald W. Pezon / SERVERA] |
| **Sent:** | Monday, June 28, 1999 12:10 PM |
| **To:** | lehighras |
| **Subject:** | Cust Sat Surveys |

To help you get your survey returns up, please:

1)  send surveys to ALL NEW CONNECTS where you worked with customer, electrician, or builder.  The person you send the survey to should be the person you worked with to connect the account and they should know you and your work.

2)  Notify customers who you meet with that we care about customer satisfaction and that they will be receiving a satisfaction survey.  Ask them politely to return it promptly when it arrives.

3)  Please send out surveys to all types of customer interractions like:   service, sales, billing matters, project management, etc.  If our "surveys sent" number doesn't rise significantly this coming month, I will be forced to mail surveys to those customers I see you are meeting with(Sched Plus and expense account).  As we spoke, and for our own good on the annual ratings, please make the number of surveys sent and returned go up in July.

4)  Please send out surveys to

Ronald W. Pezon P.E. / C.E.M.
Regional Service Supervisor
Tel. 610.774.3797 Fax 610.774.3260
E-mail: rwpezon@papl.com

PP&L, Inc.
Two North Ninth Street
Allentown, PA 18101-1179
Tele. 610.774.5151
http://www.papl.com/

**ppl**

*COPY*

*Guy ~ office phone was Valley ~
has had no record of a trailer
remove it, no
inquiries
on this
job.*

*contact person*

January 13, 2000

Mr. Barry Miller
Meadow Valley Electric
2010 West Main Street
Ephrata, Pa 17522-1114

RE: Turkey Hill Mini Market, Macungie
Job #: 164009

Dear Mr. Miller:

You recently dealt with PP&L's Field Service Organization. We value your opinion, and would like to know whether we met your expectations. To help us, would you please take a few minutes to complete and return the enclosed questionnaire?

Holding the line on costs to keep your electric rates low is a priority for PP&L, Inc. We're proud that among 14 utilities in the region, our transmission and distribution costs are the lowest per line-mile. But we recognize that service to you, our valued customer, is every bit as important as keeping costs down. Your responses let us know how we are doing in both these areas, and are very important in our continuing efforts to improve.

Please feel free to contact our Field Service Organization for any questions about your electric service and related issues. Our Industrial & Commercial Services group (ICS) can assist you with billing, customer choice, and service related issues. You can reach an ICS specialist between 7 AM and 5 PM, Monday through Friday, by calling 1-888-220-9991.

Thank you very much for your assistance.

Sincerely,

Ronald W. Pezon

Enclosure(s)

*Ron : our only contact with
your company on this job was
with Jim Lutz
his work was fine but we were
delayed in hook up at least 3 weeks
longer than we wanted. I doubt
that it was Jim's fault*

*Barry Miller*

PP&L Inc. values your opinion.  You recently dealt with Les Wilson from PP&L.  Please take a few minutes to let us know what you thought of our service?

Please rate us by circling one number for each of the following questions, using a scale from 1 to 5 as shown below:



    5 -- Completely Satisfied
    4 -- Somewhat Satisfied
    3 -- Neither Satisfied Nor Dissatisfied
    2 -- Somewhat Dissatisfied
    1 -- Completely Dissatisfied

1.  Did the Representative named above take care of your request/project to your satisfaction?

Comments: _Les did not talk to_ 5 _us_ 4 _on_ 3 _this_ 2 _Job # 164009_ 1

2.  How satisfied were you with the length of time to take care of your request/project?

                                                   5      4      3      (2)      1
Comments: _____

3.  How satisfied were you with this representative's knowledge?

Comments: _(Jim Lutz was our contact)_ (5)   4    3    2    1

4.  How satisfied were you with this representative's courtesy:

Comments: _(Jim Lutz)_            (5)    4    3    2    1

5.  How would you rate your overall satisfaction with this representative?

Comments: _(Jim Lutz)_            (3)    4    3    2    1

6.  How would you rate your overall experience with PP&L, Inc.?

                                                   5    (4)    3    2    1
Comments: _____

7.  How satisfied are you with PP&L's efforts to keep costs down?

                                                   5    (4)    3    2    1
Comments: _____

PP&L, Inc. is committed to improving the quality of electric delivery service to you...our valued customer.  How can we better meet your needs?  We welcome your added comments!

_It would be helpful to Know who the Custmer Rep is -_

Optional
Name: _Barry Miller_                         E-Mail Address: _barry @ mvetsco.com_

Phone #: _738-3451_                          Fax #: _717-738-1770_

Company _Meadow Valley Electric Inc_    PP&L Job # _164009_
                                             Customer #:

**Thank you for completing this questionnaire.  Please return it in the enclosed postage-paid envelope.**

W-3

*PPL application   3/30 199?   sending actual 3/2000   Josh Ham   Long Rumba - Audit Fred*
*12/1/99  150*
*Ret 3/23   Ed Babb.*

# WERE YOU HAPPY WITH OUR SERVICE?

PPL Electric Utilities Corporation values your opinion. You recently dealt with Les Wilson from PPL. Please take a few minutes to let us know what you thought of our service?

*↑ Never Delt with him*

Please rate us by circling one number for each of the following questions, using a scale from 1 to 5 as shown below:

*CC Les   gen*

*" called w/ memos 3/28/00  Deg ✓*

5 — Very Satisfied
4 — Somewhat Satisfied
3 — Neither Satisfied Nor Dissatisfied
2 — Somewhat Dissatisfied
1 — Very Dissatisfied

**COPY**

*give ICS   1 888 2209*

1. Did the Representative named above take care of your request/project to your satisfaction?

    5        4        3        2        1

    Comments:_____ *no entry* _____

*Keep P surve   reminded 1   serviel   to send surveys people   must with*

2. How satisfied were you with the length of time to take care of your request/project?

    5        4        3        2        (1)

    Comments:_____ *remove this - delay not Les's control.* _____
    *under*

3. How satisfied were you with this representative's knowledge?

    5        4        (3)        2        1

    Comments:_____ *keep* _____

4. How satisfied were you with this representative's courtesy:

    5        4        3        2        (1)

    Comments:_____ *keep* _____

5. How would you rate your overall satisfaction with this representative?

    5        4        3        2        1

    Comments:_____ *no entry* _____

6. How would you rate your overall experience with PPL Corp.?

    5        4        3        2        (1)

    Comments:_____

7. How satisfied are you with PPL's efforts to keep costs down?

    5        4        3        2        (1)

    Comments:_____

PP&L, Inc. is committed to improving the quality of electric delivery service to you...our valued customer. How can we better meet your needs? We welcome your added comments!

_____
_____
_____

*Optional*

Name: _David P Dagostino_        E-Mail Address: _____

Phone #: _215-249-9085_        Fax #: _____

Company _Dagostino Company, Inc_        PPL Customer #: _____

Thank you for completing this questionnaire. Please return it in the enclosed postage-paid envelope.

W-23

# FIELD SERVICE OPERATIONS SURVEY

PP&L values your opinion. Would you please take a few minutes to provide us with some feedback about your recent experience with PP&L and specifically your experience with Les Wilson.

**(Circle your response)**

Concerning your recent experience with FSO, was your project managed to your satisfaction?

| Completely Satisfied | Somewhat Satisfied | Neither satisfied nor dissatisfied | Somewhat Dissatisfied | **Completely Dissatisfied** |

Was your project completed within your expected time schedule?

| Completely Satisfied | Somewhat Satisfied | Neither satisfied nor dissatisfied | Somewhat Dissatisfied | **Completely Dissatisfied** |

How satisfied were you with your service representative's knowledge?

| Completely Satisfied | Somewhat Satisfied | Neither satisfied nor dissatisfied | Somewhat Dissatisfied | **Completely Dissatisfied** |

How satisfied were you with the courtesy of your service representative?

| Completely Satisfied | Somewhat Satisfied | Neither satisfied nor dissatisfied | Somewhat Dissatisfied | **Completely Dissatisfied** |

How would you rate your overall experience with Field Service Operations?

| Completely Satisfied | Somewhat Satisfied | Neither satisfied nor dissatisfied | Somewhat Dissatisfied | **Completely Dissatisfied** |

How would you rate your overall experience with PP&L?

| Completely Satisfied | **Somewhat Satisfied** | Neither satisfied nor dissatisfied | Somewhat Dissatisfied | Completely Dissatisfied |

PP&L has worked hard to keep costs down. How satisfied are you with these efforts?

| Completely Satisfied | Somewhat Satisfied | Neither satisfied nor dissatisfied | Somewhat Dissatisfied | **Completely Dissatisfied** |

PP&L is committed to improving the quality of the service we provide. How can we better meet your needs?

HAVE KNOWLEDGABLE COMPETANT & COURTEOUS REPRESENTATIVES DEALING W/YOUR BUILDER/DEVELOPERS. I WANT TO KNOW THAT THE PERSON I'M DEALING WITH CARES ABOUT MY PROBLEMS & NEEDS & IS WILLING TO

**Additional Comments:** WORK WITH ME. THAT WAS NOT MY EXPERIENCE WITH LES WILSON. HIS 'COULD CARE LESS' ATTITUDE WAS OFFENSIVE AND UNACCEPTABLE, AND WHEN COMBINED WITH

**Optional:** HIS INEXPERIENCE, AND LACK OF KNOWLEDGE, AND

**Name:** COMPLETE LACK OF A SENSE OF URGENCY AND

**Company:** TIMLINESS LED TO A UNACCEPTABLE EXPERIENCE.

**Phone:**

Thank you for completing this questionnaire for account #:

A postage paid envelope is enclosed for your convenience.

r:\fso\satisfaction survey\survey package (ltr & survey).doc

EXHIBIT

EXHIBIT

Pezon, Ronald W.

**From:** Pezon, Ronald W. [Ronald W. Pezon / SERVERA]
**Sent:** Wednesday, September 23, 1998 01:05 PM
**To:** Wilson, Leslie E. / 220-3795, Field Service Operations , Field Service Operations
**Subject:** Agreement On Performance Improvements

**Importance:** High

This letter confirms our agreement reached at yesterdays meeting where we discussed ways to help improve your performance as Service Consultant. As we discussed at length this week, our intent here is to help you get back on track for the numerous projects you are being asked to manage. To start, we will work in four specific areas.

1)  Accuracy Of Records:

a.  in-service dates will be pro-actively negotiated and mutually agreed upon with customers
b.  actual in-service date is when customer's power is turned on (posted dates in SCS)
c.  if "actual service date" shows up later on the spreadsheet than that of customer agreement in (a), it constitutes a missed service date and will be noted as such on your monthly report.
d.  Our 1998 goal is to meet 90% of in-service dates for all projects managed.
e.  your "job-list" excel spreadsheets will be accurate and submitted to RWP by 10/1/98 and then weekly with your week plan described below.

Corrective Consequences:
1) no more warnings: missed dates in record keeping are missed dates. Monthly report will be correct.
2) Inaccuracies continue beyond that natural consequence, then next official step is "Oral reminder" in the Responsible Behavior Program.

2)  Project Management

a.  exhibit behaviors of pro-active thinking and project management using your job-lists
b.  demonstrate a commitment to meeting customer needs with date-certain follow-up
c.  accept complete responsibility for your service jobs and job-list progress
d.  take project management/customer concerns to RWP before a problem arises
e.  communicate both job-lists monthly (est. in-service and actual in-service) to AES's in your regions.

Consequences:
1) next complaint from customer about project management that is Les's responsibility will enact official step: Oral Reminder in Responsible Behavior Program.

3)  Process Flow

a.  let all your customers know when appropriate that you are responsible for the process
b.  position yourself to be your customers' single point of contact for service coordination
c.  get to know and then work the established electric service coordination process
d.  ask for help from others in RAS, FSO, AES's, Technicians, and RSS when needed
e.  completely develop your flow chart, then regularly follow each job using your "Residential Development Process" (your draft was completed 9/22/98)

4)  Prepare & Submit A Weekly Plan

a.  list and describe major objectives for the next week
b.  list and briefly describe major tasks to accomplish those objectives
c.  weekly plan should parallel Schedule Plus's meeting schedule
d.  briefly describe weekly accomplishments toward each objective/task
e.  submit "proposed week" plan and "completed week" plan to RWP by 5pm Fridays.

Please use our discussions and this summary agreement letter to help you better manage your time for improved effectiveness as a Service Consultant. Let me know if I have not

1

accurately captured your intentions as we discussed them this week.

Sincerely,
Ron

**Pezon, Ronald W.**

| | |
|---|---|
| **From:** | Pezon, Ronald W. |
| **Sent:** | Monday, April 05, 1999 04:54 PM |
| **To:** | Wilson, Leslie E. |
| **Subject:** | Pick a day |

Recipient Type: BCC

-------
Please pick a day to be in Buxmont that they can count on and only make changes as needed
to accommodate other meetings.  I will honor your selection as well in planning our
meetings.  Just let me know which day you will be down there.  Please plan all your
Buxmont calls for that day.  Please keep schedule plus updated for that Buxmont day.

**Pezon, Ronald W.**

| | |
|---|---|
| **From:** | Wilson, Leslie E. |
| **Sent:** | Tuesday, April 06, 1999 09:52 AM |
| **To:** | Pezon, Ronald W. |
| **Subject:** | RE: Pick a day |

```
I will be there on wednesdays.
----------
From: Pezon, Ronald W.
To: Wilson, Leslie E.
Subject: Pick a day
Date: Monday, April 05, 1999 4:53PM

Please pick a day to be in Buxmont that they can count on and only make changes as needed
to accommodate other meetings.  I will honor your selection as well in planning our
meetings.  Just let me know which day you will be down there.  Please plan all your
Buxmont calls for that day.  Please keep schedule plus updated for that Buxmont day.
```

EXHIBIT

Wilson 15

**Pezon, Ronald W.**

| | |
|---|---|
| **From:** | Pezon, Ronald W. |
| **Sent:** | Friday, September 03, 1999 09:47 AM |
| **To:** | Anderson, David G.; Stano, Robert L.; Weidman, David E.; Wilson, Leslie E. |
| **Cc:** | Ling, David A. |
| **Subject:** | Effective Use Of Time For Goal Items |

Recipient Type: BCC

-------
We are all concerned about our performance and overall rating at the end of the year.  To
help us achieve our 1999 goals (for a desirable rating for and me),  I am implementing a
change that should help us to improve our effectiveness and ability to be successful by
December 1999.

Lehigh Region is consistently way over average on miles driven and therefore time spent in
the car.  Please immediately make a change in your work habits to drive less than 750
miles per month.  I will approve expense accounts with 750 miles or less per month-no
more.  This time management change will increase your available time to work on goal items
needing your immediate attention.  Please rely more heavily on the phone, mail, Fed Ex, e-
mail,  Technician's, and AES's for sales and service jobs/updates.  Tech's and AES's are
your eyes in the field everyday and a good relationship with them is imperative.

In our recent study of miles driven by service consultants (SC) and service engineers (SE)
we found that on average a SC drives their personal car approximately 8400 miles per year
(700 miles/month) and SE's driving personal cars drive an estimated 9,200 miles per year
(766 miles/month).  People driving company cars drive nearly the average or less miles per
year than those driving personal cars.

After doing some calculations and thinking about your actual mileage compared to that of
the average for your job classification, I have concluded that a Lehigh Region driving
time reduction plan will improve our effectiveness in important goal areas where we are
presently falling short.  Please make the change this month in time to bring up your goal
attainment (in all areas) before the end of the year.  We will talk more about that in our
upcoming goals review.

A couple of you regularly turn in 1400 miles per month (highest mileage in FSO) so I will
show that example.

Here's the calculation:
1400 miles per month divided by about an average 40 miles per hour  = about 35 hours per
month

12 months per year times 35 hours per month = 420 hours per year

420 hours per year divided by 40 hours per week = 10.5 weeks

Here's the thinking:   10.5 WEEKS SPENT IN THE CAR!  10.5 weeks of your work time is a lot
of time to spend away from your goal items.  All this time is not being spent talking with
customers.  All that time is not being spent selling.  It is not spent sending out or
returning surveys.  It is not spent talking with customers about electric service jobs.
It is not spent contributing directly to your (or my) goals.  Please increase your time
spent on goal items (as appropriate for you) by reducing the miles that you drive in
Lehigh Region.

Looking further to the value of that time:  At 1400 miles per month at an estimate fully
loaded cost per hour of $80/hour times 40 hours per week times 10.5 weeks = $33,600.
Dropping that number to 750 miles per month is a cost for time at about $18,000 per year.
A time savings worth $15,600.  The real value is that you would have more time to turn
around your goal attainment this year and next.  I would like to see you  use the $15k
worth of time figuring out how to achieve one or more of your goals which really pay off
for you.

According to our 1999/2000 PFP goals:   Goal attainment is what gives you the overall
rating you desire, and pays you.

Therefore again, effective immediately, I am asking you (who need) to make changes in

1

Lehigh, to increase your available time for goal items by reducing your travel mileage and time spent traveling.  Starting with your September expense account, I will approve 750 miles or less per month.  This is a permanent change.  Expense accounts showing over 750 miles/month will be returned to you.

# REQUEST FOR APPROVAL TO SECURE ASSISTANCE OF AUDITING OR HUMAN RESOURCE AND DEVELOPMENT IN CONDUCTING AN INVESTIGATION

| Name of Employee(s) or Incidents to be Investigated: |  |
|---|---|
| Leslie E. Wilson | |

| Title: | Business Unit: *(previously called Department)* |
|---|---|
| Service Consultant-Field Svc Ops. | Power Delivery |

Date(s) of Incident(s):
                                                1998/1999/2000

Description of Incident(s):

*Numerous developers have complained about Les not getting back to them, or not knowing that he was in charge of coordination for their project.
*There are presently about 15 developments needing/not getting his attention.
*Technicians have been observed doing Les's job of development coordination.
*In mid 1999 Les had driven over 15,000 miles (12 months) on company business.
*Time was scheduled to go out with Les on customer calls. His calls were cancelled at the last minute or they were never really scheduled.
*Numerous customer satisfaction surveys were returned -"bad addresses/names".
*Satisfaction surveys were returned, or called back - "never worked with Les".
*Used "virtual office" phone for personal calls to Phila.,re-paid PPL monthly.
*Les signs out to Buxmont SC for work, local AES does not always observe same.
*Phone conversations/Church business during normal work hours.
*Letter to Mr. William Hecht 9/10/98 complaint - not getting response from Les.

General Description of Concerns and Nature of Alleged Violation:

Over the years of observation and working to help Les, he has not been able, for some reason(s) to complete his work over extended periods of time and to be an effective Service Consultant. Without constant reminders about timeliness on important sales and service duties from his supervisor, he has been unable to effectively manage his workload on his own. He appears to be signed out of the office, but I am suspect that he may not always be meeting with the people or companies he says. From expense account records, he often drives to one appointment in a given work area and spends a great deal of time there. The work described/scheduled on "calander", appears to be trivial and of short duration. Les appears to be using company time for other purposes since he does not seem to be putting in the time and job-coordination efforts required of him to adequately meet his PPL Company and customer obligations. What does he do with his time, mileage, e-mail, phone, virtual phone, cellular phone?

Manager Requesting Investigation:

*Allen C. Cassaday*

| Signature: *Allen C. Cassaday* | Business Unit: *(previously called Department)* Power Delivery | Date: 5/9/00 |
|---|---|---|

☑ APPROVED

*Robert M. Genecglio*                                5/11/00
Business Unit Vice President or General Manager          Date

EXHIBIT

Rohrer 2
7/18/03    EK