IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

------------------------------ x

LESLIE WILSON,                          :

            Plaintiff,          :

      v.                               :   Civ. No. 02-CV-4662

                             (Kauffman, J.)

PPL ELECTRIC UTILITIES                  :
CORPORATION,

                        :

            Defendant.

------------------------------ x

**REPLY MEMORANDUM OF LAW IN SUPPORT**
**OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................................1

I.    PLAINTIFF HAS FAILED TO SET FORTH ANY FACTS UPON WHICH A
REASONABLE JURY COULD CONCLUDE THAT PPL'S LEGITIMATE,
NON-DISCRIMINATORY REASONS FOR PLAINTIFF'S TERMINATION
WERE A PRETEXT FOR UNLAWFUL DISCRIMINATION ........................................2

        A.    There Is Absolutely No Evidence Upon Which a Jury Could
Conclude That PPL's Reasons For Terminating Wilson's
Employment Were False or Are Unworthy of Belief ..................................2

        B.    Plaintiff Has Not Adduced Any Evidence That Discrimination
Was More Likely Than Not A Determinative Cause Of PPL's
Decision To Terminate His Employment .......................................................7

                1.    Plaintiff Has Failed To Identify Any Similarly Situated
Caucasian Or Younger Employees Who Were Treated
More Favorably By The Company ...................................................8

                2.    Plaintiff Has Failed To Adduce Any Evidence That His
Race or Age Was A Factor In The Company's Decision To
Terminate His Employment ............................................................11

II.    PLAINTIFF HAS FAILED TO PROFFER ANY EVIDENCE THAT HE WAS
HARASSED OR SUBJECTED TO DISPARATE TERMS AND CONDITIONS
OF EMPLOYMENT PRIOR TO HIS TERMINATION ...................................................14

III.    PLAINTIFF HAS FAILED TO ADDUCE ANY FACTS TO SUPPORT HIS
RETALIATION CLAIMS................................................................................................17

CONCLUSION....................................................................................................................20

## TABLE OF AUTHORITIES

**CASES:**                                                                                              **Page**

Bedford v. SEPTA,
  867 F. Supp. 288 (E.D. Pa. 1994) ..............................................................................19

Berninger v. Keebler Co.,
  No. Civ. A. 98-CV 600, 1999 WL 554596 (E.D. Pa. June 23, 1999), aff'd without op.,
  213 F.3d 628 (3d Cir. 2000) ......................................................................................8

Briody v. Am. Gen. Fin. Co.,
  No. Civ. A. 98-2728, 1999 WL 387269 (E.D. Pa. May 28, 1999) ...........................................3

Ezold v. Wolf, Block, Schorr & Solis-Cohen,
  983 F.2d 509 (3d Cir. 1992)...............................................................................8, 13

Facciponti v. Wood Co.,
  No. 98-CV-4025, 1999 WL 1073618 (E.D. Pa. Nov. 12, 1999) .....................................12, 14

Fireman's Ins. Co. v. Du Fresne,
  676 F.2d 965 (3d Cir. 1982)...............................................................................18

Fuentes v. Perskie,
  32 F.3d 759 (3d Cir. 1994)...............................................................................2, 3, 7

Fullman v. Henderson,
  146 F. Supp. 2d 688 (E.D. Pa. 2001), aff'd without op., __ F.3d __,
  2002 WL 397697 (3d Cir. Feb. 13, 2002)...............................................................8

Harris v. Forklift Sys.,
  510 U.S. 17 (1993)...............................................................................17

Harris v. SmithKline Beecham,
  27 F. Supp. 2d 569 (E.D. Pa. 1998) ...............................................................17

Hook v. Ernst & Young,
  28 F.3d 366 (3d Cir. 1994)...............................................................................13

Krouse v. Am. Sterilizer Co.,
  126 F.3d 494 (3d Cir. 1997)...............................................................................17

Pivirotto v. Innovative Sys.,
  191 F.3d 344 (3d Cir. 1999)...............................................................................12-13

Shaner v. Synthes USA,
  204 F.3d 494 (3d Cir. 2000)...............................................................................17

Tyler v. SEPTA,
    No. Civ. A. 99-4825, 2002 WL 31965896 (E.D. Pa. Nov. 8, 2002)........................ 8, 11, 18-19

Williams v. Greyhound Lines,
    No. 97-6997, 1998 U.S. Dist. LEXIS 12986 (E.D. Pa. Aug. 11, 1998),
    aff'd without op., 203 F.3d 818 (3d Cir. 1999) ...................................................................8, 11

## PRELIMINARY STATEMENT

Defendant PPL Electric Utilities Corporation ("PPL" or "Defendant" or "Company") submits this reply memorandum of law to respond to the contentions raised in plaintiff Leslie Wilson's ("Wilson") memorandum of law in opposition to PPL's motion for summary judgment.

As discussed below, plaintiff has submitted to this Court opposition papers replete with conclusory assertions, mischaracterizations of the record (including plaintiff's own deposition testimony), and irrelevancies in a desperate attempt to obfuscate the simple and undeniable fact that plaintiff has failed to present any evidence showing that his age, race or prior lawsuit was a factor in PPL's decision to terminate his employment. The Company's decision was made only after it caught Wilson (on videotape) over a six day period visiting banks, churches, paint stores, restaurants, and his home for large portions of the workday when he should have been performing his job duties (including visits to customers), *and then*, after stealing the Company's time, having the audacity to submit a false expense report seeking mileage reimbursement for trips to customers that he did not make.

Wilson has presented no evidence that "similarly situated" Caucasian or younger employees were treated more favorably than him, and, indeed, wholly ignores the undisputed fact that a Caucasian employee holding the same position was terminated at about the same time, by the same decision maker, after an investigation revealed that the employee engaged in similar (although less egregious) conduct to that of Wilson. Moreover, the law is clear in this Circuit that Wilson's alleged evidence of "stray remarks" is insufficient to defeat summary judgment because the remarks were allegedly uttered by individuals who had no involvement or input in

1

the decision to terminate his employment, were wholly unrelated to the termination decision (and

the facts and circumstances underlying that decision), and occurred well prior to the time that

Wilson was terminated.[1]

I.     **PLAINTIFF HAS FAILED TO SET FORTH ANY FACTS UPON WHICH A
       REASONABLE JURY COULD CONCLUDE THAT PPL'S LEGITIMATE, NON-
       DISCRIMINATORY REASONS FOR PLAINTIFF'S TERMINATION WERE A
       PRETEXT FOR UNLAWFUL DISCRIMINATION.**

       A.     **There Is Absolutely No Evidence Upon Which a Jury Could Conclude
              That PPL's Reasons For Terminating Wilson's Employment Were
              False Or Are Unworthy of Belief.**

              PPL has proffered overwhelming and uncontroverted evidence that it terminated

Wilson's employment only after he was caught by Company investigators conducting substantial

personal business on Company time, submitting a false expense report, charging hundreds of

personal calls on his Company phone, and lying to the investigators about his activities on the

days of the surveillance.  (Geneczko Decl., ¶ 6).[2]  Wilson has not demonstrated any "weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in [PPL's] proffered legitimate

reasons for its action that a reasonable factfinder could rationally find them 'unworthy of

credence.'"  Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

---

[1]     References to Plaintiff's Brief In Opposition To Defendant's Motion for Summary
        Judgment are cited to as "Pl. Br., at __."  References to Memorandum of Law in Support
        of Defendant's Motion for Summary Judgment are cited to as "Def. Mem., at __."

[2]     The Declarations of Ronald Pezon ("Pezon Decl."), Douglas Rehrer ("Rehrer Decl."),
        Kenneth Hartman ("Hartman Decl.") and Robert Geneczko ("Geneczko Decl."), were
        submitted in support of its motion for summary judgment and are incorporated herein.
        Excerpts from the deposition transcripts cited herein, together with exhibits cited therein,
        were annexed to the Declaration of Daniel R. Halem, Esq., also submitted below and
        incorporated herein, and are referred to as "Wilson Tr. __," "Pezon Tr. __," etc.
        Additional excerpts from deposition transcripts cited hein are annexed to the
        Supplemental Declaration of Daniel R. Halem, Esq.

To the contrary, rather than present any evidence upon which a jury could reasonably infer that PPL's reasons for terminating Wilson's employment were false, Wilson merely offers unsubstantiated excuses and rationalizations to justify his admitted fraud that were rejected by the Company after its thorough investigation, and amount to nothing more than disagreement with PPL's decision to terminate his employment. Indeed, even if Wilson had presented any evidence to support his "innocence" (which, as discussed below, he plainly has not), or that the Company treated him too harshly (which is conclusively refuted by the fact that a Caucasian employee who engaged in similar misconduct was also terminated), the law is clear that a plaintiff cannot survive summary judgment simply by presenting evidence that "[PPL's] decision was wrong or mistaken." Fuentes, 32 F.3d at 765. See also Briody v. Am. Gen. Fin. Co., No. Civ. A. 98-2728, 1999 WL 387269, at *5 (E.D. Pa. May 28, 1999) (the only "question is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent").

With that being said, although it makes not a whit of difference for purposes of this motion, Wilson has not even presented evidence from which a jury could conclude that PPL's decision to terminate his employment was wrong, mistaken or otherwise imprudent. To the contrary, the various (and constantly shifting) excuses and justifications which Wilson relies upon to justify his conduct conflict with the undisputed factual record including his own deposition testimony.

First, there is no dispute (and can be no dispute in light of the videotaped surveillance) that Wilson submitted to the Company an expense reimbursement form in June 2000 claiming mileage for travel to meetings which he admittedly did not make on the days in question. (Rehrer Decl., ¶¶ 10, 11, Wilson Tr. 168-70, 172, 194-95, 203-07, 217-24, 229).

3

When confronted with this conduct during his interviews with Company investigators, Wilson claimed that it was his practice (and his department's practice) to request mileage reimbursement based on his work schedule even if his work schedule did not reflect his actual activities. (Reher Decl., ¶ 11, Wilson Tr. 172-73). However, after interviewing the other members of Wilson's work group, the Company determined that his preposterous claim of a departmental practice of submitting false expense reports was utterly baseless, and Wilson has adduced no evidence to the contrary.[3] (Rehrer Decl., Ex., B. at 6).

At deposition (and in response to defendant's motion), Wilson offered a new explanation for his fraud, contending that while his expense report may not have reflected his actual activities on the days at issue, his "total reimbursable mileage resulted in no undeserved reimbursements from PPL" because he actually made the trips for which he was reimbursed on other days of the same week the appointment had been scheduled. (Pl. Br., at 5-4, Wilson Tr. 172-73). However, not only did Wilson fail to produce any evidence to support this "post-hoc" fabrication (and, indeed, could not recall at deposition attending any of these alleged appointments (Wilson Tr. 188-89, 191, 196, 202-03, 209-17, 225-28)), but it is directly contrary to the undisputed facts: (i) that the Company's surveillance showed that he did not travel to any of the places he claimed on his expense report during *any* of the six days that he was followed between June 13 and June 21; (ii) that the developers of some projects told PPL investigators that Wilson *never* visited (on any day) the places for which he claimed travel reimbursement (Rehrer Decl., ¶ 12); and (iii) that Wilson himself admitted that he submitted mileage reimbursement for

---

[3]    At deposition, Wilson was unable to provide an example of another employee in his work group requesting reimbursement for mileage that the employee did not actually drive. (Wilson Tr. 343-344).

travel to customers when the work was done at his office (and not at the customer's site) (Wilson Tr. 203-207).

Second, Wilson does not even attempt in his brief to offer any explanation as to why he failed to attend *every* single appointment that he purportedly scheduled on the six days of the surveillance, and only speculated at deposition that all of his purported appointments were cancelled. (Wilson Tr. 188, 191, 206-08, 223-24, 227-30). Moreover, as discussed above, the Company confirmed through its investigation that Wilson never even had scheduled many of the meetings set forth in his work schedule (and for which he claimed mileage reimbursement). (Rehrer Decl., ¶ 12, Exs. B, F).

Third, while Wilson attempts to explain away the substantial and sporadic periods of time he was observed at his home during the surveillance by claiming that he was a "virtual employee" (and thus permitted to work on home), this explanation entirely misses the point because it is undisputed that Wilson was consistently observed at home (unbeknownst to his supervisor) when his work schedule indicated that he was to be visiting customers or working from the Buxmont or Lehigh offices. (See Def. Mem., at 10-16). Moreover, despite claiming in his brief that he "was working from home" during these periods (some of which lasted nearly three hours) (Pl. Br., at 5), Wilson very clearly and plainly testified at deposition that he does not know what he was doing at home, and "can't be sure if he was doing work." (Wilson Tr. 227-228; 196).

Fourth, in light of the undisputed fact that Wilson literally spent the majority of some work days engaging in purely personal business, Wilson's assertion in his brief that a jury could reasonably conclude that his other "personal business side trips" were "brief and

5

reasonable" (Pl. Br., at 5) simply punctuates the extent to which Wilson distorts (and

mischaracterizes) the record in an attempt to save his frivolous claims from dismissal. Indeed,

although Wilson's activities are fully described in defendant's initial brief (at 10-16), by way of

example, on June 16, 2000, Wilson left work at 11:16 a.m. and failed to return until 2:44 p.m.,

filling the heart of his work day with two trips to his church, a visit to a restaurant, a brief visit to

his home, a trip to a paint store and a visit to a carpet store. (Rehrer Decl., ¶ 10(c)). Similarly,

on June 20, 2000, Wilson (who was scheduled to report to work at the Lehigh Service Center at

8:00 a.m.) engaged in personal errands until 9:49 a.m. (including trips to a Home Depot and

paint store), and then left work at 12:11 p.m. to engage in personal business until at least 3:20

p.m., at which point the surveillance lost him. (Rehrer Decl., ¶ 10(e)). We respectfully submit

that no reasonable jury could conclude that PPL was being, in plaintiff's words, "hyperviligant"

(Pl. Br., at 5) by expecting that Wilson perform his job duties during working hours rather than

spending large portions of the workday visiting paint stores, hardware stores, his home and

churches.

      <u>Fifth</u>, although Wilson's claim that his "failure to reimburse PPL for his personal

cell phone usage was nothing more than a miscommunication," the undisputed factual record

fails to reveal any miscommunication between the Company and Wilson with respect to his use

of his Company issued cellular phone. To the contrary, Wilson testified at deposition that he was

aware of the Company policy that Company issued cellular phones are not intended for "personal

use" (Wilson Tr. 136-37), that he was required to reimburse the Company for personal phone

calls made on Company issued phones (and had done so in the past) (Wilson Tr. 276), that he did

not inform his supervisor that he was making personal calls on his cell phone, and that he did not

make any attempt to reimburse the Company for the $1,000 worth of personal calls he made

during a 21 month period, despite his belief that his cell phone usage would "create problems"

for him. (Wilson Tr. 246-48, 269, 275-278). Wilson's supervisor Pezon testified that he was

unaware that Wilson was using his cell phone for personal use. (Pezon Tr. 184-85). Therefore,

plaintiff's claim that a "rational jury might believe that it was PPL's practice *not* to expect

reimbursement" (Pl. Br., at 6) plainly cannot be inferred from the factual record before this

Court.

Thus, Wilson has failed to adduce any evidence that PPL's decision (following an

extensive investigation by experienced PPL investigators) to terminate his employment for

egregious fraud is "unworthy of credence" Fuentes, 32 F.3d at 765. Indeed, the "weaknesses,

implausibilities, inconsistencies, incoherencies, [and] contradictions," id., lie not in PPL's

reasons for terminating Wilson, but only in Wilson's futile attempt in his brief to trivialize and

rationalize the uncontroverted fact that he was caught "red-handed" stealing the Company's

money (through the submission of at least one false expense report and using his Company cell

phone as if it was his personal cell phone) and stealing the Company's time by performing

significant personal business rather than PPL business during working hours.

**B.    Plaintiff Has Not Adduced Any Evidence That Discrimination Was More Likely Than Not A Determinative Cause Of PPL's Decision To Terminate His Employment.**

In addition to failing to present a shred of evidence that PPL's reasons for

terminating his employment were false or unworthy of credence, Wilson has not adduced a

scintilla of evidence that similarly situated Caucasian or younger employees were treated more

favorably by the Company, or that Robert Geneczko considered Wilson's age or race when

making the decision to terminate his employment based on the results of the investigation of his work activities conducted by the PPL Security Services Department.[4]

      1.    **Plaintiff Has Failed To Identify Any Similarly Situated Caucasian Or Younger Employees Who Were Treated More Favorably By The Company.**

Plaintiff does not (and cannot dispute) that in order to state a claim for disparate treatment, he must show by competent evidence that *similarly situated* individuals outside of the protected class received more favorable treatment from the Company. Tyler v. SEPTA, No. Civ. A. 99-4825, 2002 WL 31965896, at *3 (E.D. Pa. Nov. 8, 2002); Berninger v. Keebler Co., No. Civ. A. 98-CV 600, 1999 WL 554596, at *4 (E.D. Pa. June 23, 1999) (rejecting claims of age and sex discrimination because "plaintiff has produced no evidence that she was treated differently from the other former Sunshine managers"), aff'd without op., 213 F.3d 628 (3d Cir. 2000); see also Fullman v. Henderson, 146 F. Supp. 2d 688, 697 n.4 (E.D. Pa. 2001), aff'd without op., __ F.3d __, No. 01-2549, 2002 WL 397697 (3d Cir. Feb. 13, 2002); Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 539 (3d Cir. 1992).

Here, despite Wilson's wholly conclusory (and, as shown below, baseless) claim that "other employees had been upbraided for the same behavior that resulted in Mr. Wilson's termination" (Pl. Br., at 1), the undisputed facts show *just the opposite* – that the Company

---

4      Because, as discussed below and in defendant's initial brief (at 21-22), Wilson has not shown that *similarly situated* Caucasian or younger employees were treated more favorably by the Company, Wilson also fails to establish a prima facie case of discrimination. Williams v. Greyhound Lines, No. 97-6997, 1998 U.S. Dist. LEXIS 12986, at *11-2 (E.D. Pa. Aug. 11, 1998) (plaintiff failed to establish a prima facie case because there was no evidence that the employer treated similarly situated non-minority managers more favorably), aff'd without op., 203 F.3d 818 (3d Cir. 1999); Tyler v. SEPTA, No. Civ. A. 99-4825, 2003 WL 31965896 (E.D. Pa. Nov. 8, 2002) ("Because Plaintiff has failed to identify even a single similarly situated person, Plaintiff has failed to set forth sufficient evidence to establish a *prima facie* case.").

treated Wilson no differently from Caucasian employees who engaged in comparable conduct.

Indeed, Wilson wholly ignores in his brief the undisputed fact that the same individual who

terminated Wilson's employment (Robert Geneczko) terminated the employment of a Caucasian

Service Consultant after a Company investigation revealed that he too engaged in personal

business on Company time.  (Geneczko Decl., ¶¶ 8-9; Rehrer Decl., ¶¶ 19-21, Ex. I).

      Wilson's assertion that he has "proffered evidence" that other employees were not

terminated for the "same behavior" as him (Pl. Br., at 1) is not only patently false, but further

demonstrates the extent to which plaintiff has attempted to mislead this Court by misstating and

distorting the factual record.  Indeed, at deposition, when asked whether he had knowledge of

other employees who requested reimbursement for miles they did not drive, Wilson was unable

to point to a single instance in which one of his co-workers submitted an expense report seeking

reimbursement for miles he did not drive (let alone the Company's awareness or tolerance of

such conduct).[5] (Wilson Tr. 339-344).

      Similarly, although plaintiff claims that "other co-workers . . . engaged in

personal business on Company time" (citing to page 338 of Wilson's deposition transcript),

Wilson's deposition testimony makes clear that he has no personal knowledge of his co-workers

engaging in any personal business on Company time, let alone any conduct comparable to the

substantial non-Company business that he engaged in during the days of the surveillance:

> Q:    Did those individuals [Bob Stano and Dave Anderson] conduct personal
> business on company time, if you know?

---

[5]    Wilson's claim that "other co-workers used estimates to fill out their mileage logs" is
irrelevant.  Wilson was not disciplined for "estimating" his mileage for certain trips, but
rather for submitting a false expense form claiming reimbursement for trips that he did
not make.  Wilson does not claim that his co-worker Dave Anderson submitted a false
mileage expense form, or otherwise engaged in improper conduct condoned by the
Company.

9

A:    Yes, I do know.

Q:    What information do you have in that regard?

A:    Dave Anderson went to New York for a seminar on anger management. Took his wife along.  And the company paid for her to go along on the trip.

Q:    Did he receive approval from Pezon or another company official to take his wife on that trip?

A:    I don't know.

Q:    If he had received approval, would there have been anything wrong with that?

A:    No.  (Wilson Tr. 338-39)

Wilson does not (and cannot) explain in his brief how the fact that his co-worker took his wife on a business trip to New York (which, incidentally, was approved by the Company) is an example of the Company treating more favorably other employees who engaged in personal business on Company time.

Finally, Wilson's claim that others were not disciplined for making excessive personal phone calls on their Company cell phone (citing to pages 245, 269-74 of his deposition transcript – which do not contain any testimony that identifies other individuals) is directly contrary to his testimony at deposition that he has no knowledge of others who made personal phone calls on their cell phones without reimbursing the Company:

Q:    Did the other service consultants make personal phone calls on their cell phone?

A:    I don't know.  I don't have records.

Q:    Do you know if – when the other service consultants did make personal phone calls on their cell phones, whether they reimbursed the company?

10

A:   I don't know. (Wilson Tr. 279).[6]

In sum, the undisputed record evidence shows that Wilson was treated no differently from Caucasian employees who engaged in comparable conduct, and Wilson has utterly failed to adduce any evidence to the contrary. See Williams v. Greyhound Lines Inc., No. 97-6997, 1998 U.S. Dist. LEXIS 12986, at *12 (E.D. Pa. Aug. 11, 1998) (dismissing discrimination claim because the plaintiff "presents no evidence of the treatment of other non-minority managers to allow us to determine if plaintiff was treated unfairly, in comparison to others.").

2.   Plaintiff Has Failed To Adduce Any Evidence That His Race Or Age Was A Factor In The Company's Decision To Terminate His Employment.

Wilson does not (and cannot) dispute that he did not hear any comments indicating that his race or age played a role in the decision by Robert Geneczko to terminate his employment, nor was he told that his race or age was a factor in the decision.

---

[6]   Similarly, Wilson's claim that Stano and Anderson forged a signature on a customer satisfaction survey is insufficient to establish that the Company treated more leniently other employees who engaged in comparable conduct. First, Wilson testified at deposition that he had no first-hand knowledge about this alleged incident, and his supervisor Pezon, and the group's secretary Jennifer Perdick, both testified that the incident Wilson was referring to involved all of the service consultants – including Wilson – faxing or delivering (rather than mailing) surveys to customers (which was contrary to procedure) and did not involve any forgery. (Pezon Tr. 125-28; Perdick Tr. 8-10). In any event, even if Wilson did proffer competent evidence that a coworker forged a signature on a customer survey, this conduct plainly is not of "comparable seriousness" to that of Wilson which involved the conduct of substantial personal business on company time, submitting a fraudulent expense reimbursement form to the company, lying to company investigators during the investigation, and failing to reimburse the company for over $1,000.00 worth of personal phone calls. See Tyler, 2003 WL 31965896, at * 3 ("a plaintiff must establish that the employee's acts were of comparable seriousness to his own infraction, and that the employee engaged in the same conduct without such differentiating or mitigating circumstances as would distinguish the employee's conduct or the employer's resulting treatment of the employee.")

Rather, Wilson's only alleged "evidence" that his age was a factor in the Company's decision to terminate his employment is a *single* comment made by his supervisor Pezon who, in the course of discussing a work issue, allegedly commented "as we get older, we sometimes forget things." (Wilson Tr. 310). However, there is no evidence that Pezon, who was over forty years of age (Wilson Tr. 312), was even referring to Wilson when he allegedly made this comment.[7] Moreover, Wilson admits that Pezon, who he believes genuinely attempted to help him improve his performance (Wilson Tr. 112-114), made no other comments relating to age in the three years that Pezon supervised him.

In any event, it is undisputed that Pezon had no input or involvement in the decision to terminate Wilson's employment or the investigation that led to his termination (Pezon Decl., ¶ 26, Tr. 92-93, 116-18), and courts in this circuit (including this Court) have repeatedly held that stray remarks that were unrelated to the termination decision (and in this case was made by a non-decision maker) are insufficient to defeat summary judgment. See Facciponti v. Wood Co., No. 98-CV-4025, 1999 WL 1073618 (E.D. Pa. Nov. 12, 1999) (Kauffman, J.) ("the alleged age-related remarks -- which were not numerous and did not directly pertain to the decision to terminate Facciponti's employment -- standing alone, are insufficient to raise a genuine issue of fact as to whether the Company's proffered reasons were not its true reasons for Facciponti's discharge."); see also Pivirotto v. Innovative Sys., 191 F.3d 344, 359 (3d

---

[7]    All of Wilson's co-workers in his group were over 40 years of age, and one co-worker, Dave Weidman, was several years older than Wilson. (Wilson Tr. 312). Thus, Wilson's only purported evidence of age discrimination rests on the alleged fact that his supervisor (who was close in age to Wilson) on *one occasion* in a three year period asked him to write a letter that was not purportedly required of others. However, Pezon asked Wilson to document his work not because of his age, but as a result of the numerous complaints that he received concerning Wilson's performance (Pezon Decl., ¶ 15, Ex. E) and, indeed, imposed no such requirement on the oldest employee in the group (Weidman) about whom Pezon received no complaints. (Pezon Decl., ¶ 13).

Cir. 1999) ("[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992)); Hook v. Ernst & Young, 28 F.3d 366 (3d Cir. 1994) (holding that decisionmaker's stray remarks related to plaintiff's protected class insufficient to support discrimination claim in absence of evidence that remarks were related to adverse employment action).

Similarly, Wilson's claim that some co-workers made racist remarks to him (which he obviously did not believe were significant enough to reference in either his EEOC charge or his complaint or complain about to any supervisor) are insufficient to defeat summary judgment for numerous reasons.[8]  First, Wilson testified that these alleged comments were made by co-workers with no supervisory responsibility over him. (Wilson Tr. 41-46).  Second, Wilson testified that these comments were made prior to 1997, which was the year that Pezon became his supervisor, and years before he was terminated for serious misconduct.  (Wilson Tr. 41).  Third, Wilson testified that he did not complain about these alleged comments to any supervisor. (Wilson Tr. 47).  Fourth, Wilson's contention in his brief that "these remarks were, arguably, tolerated by the supervisor" (Pl. Br., at 2) is unsubstantiated bunk because there is *absolutely* no evidence in the record that any PPL supervisor, including Pezon (who was not supervising

---

[8]     At deposition, Wilson claimed that an employee Paul Burke (who did not work in his department between 1997 and his termination) and Dave Anderson called him "boy" from time to time. (Wilson Tr. 44-46).

Wilson when these comments were allegedly made) and Geneczko (who made the termination decision) were aware of any comments that were made to Wilson.[9]

In sum, these alleged stray remarks which were made by co-workers with no supervisory responsibility over Wilson, were not reported to management, occurred years before his termination, and were not related to the termination decision (or even the decision to investigate his conduct) do not, as a matter of law, constitute evidence that PPL considered Wilson's race or age when making its decision to terminate his employment. See Facciponti, 1999 WL 1073618, et al., supra.

Thus, the record is devoid of even a single fact from which a jury could conclude that PPL's decision terminate Wilson's employment based on the results of the investigation was motivated by his race or age.

## II.    PLAINTIFF HAS FAILED TO PROFFER ANY EVIDENCE THAT HE WAS HARASSED OR SUBJECTED TO DISPARATE TERMS AND CONDITIONS OF EMPLOYMENT PRIOR TO HIS TERMINATION.

Wilson's claim that he was "subjected to a higher level of scrutiny and criticism than his coworkers" (Pl. Br., at 7-8) by his supervisor Pezon as a result of his age and race is utterly frivolous because it is undisputed that Wilson was the only employee in Pezon's work group who was the subject of numerous complaints from customers and other PPL employees regarding job performance.  (Pezon Decl., ¶ 13; Hartman Decl., ¶¶ 4, 7).  Indeed, at deposition, Wilson admitted that any additional "requirements" that Pezon placed upon him were not because of his race, but so there would be "no more problems or concerns on the jobs." (Wilson Tr. 108, 114).

---

[9]    Nor is there any evidence in the record that Wilson worked in a "small office atmosphere" or that supervisors were present (or in the vicinity) when these alleged comments were made.

14

For example, although Pezon required Wilson to submit a weekly work plan and schedule for Pezon to review, it is undisputed that Pezon made that request as part of an effort to improve Wilson's management of his work after numerous customers and other PPL employees complained about Wilson's performance. (Pezon Decl., ¶¶ 6-8, 14-15; Wilson Tr. 112-14). Indeed, as fully described in defendant's initial papers, one major PPL customer, Ira Lehrich, wrote an unprecedented complaint letter directly to the CEO of PPL complaining that Wilson's "ineptitude" "could put him out of the building business" (Pezon Decl., ¶ 7), and Ken Hartman, PPL's Area Engineering Supervisor for Lehigh, complained to Pezon that Wilson's failure to perform his job duties was having an adverse effect on customers and the employees in his group. (Hartman Decl., ¶¶ 4-7). Wilson cannot, as a matter of law, establish disparate treatment because it is absolutely undisputed that Pezon did not receive complaints about the job performance of Wilson's coworkers. (Pezon Decl., ¶ 13; Hartman Decl., ¶¶ 4, 7; Wilson Tr. 72).

Wilson's claim that he was the only employee investigated by the Company "despite the fact that the entire department – and not just Mr. Wilson – was warned about excessive cell phone usage, as well as excessive mileage, and "inaccurate" customer satisfaction surveys" (Pl. Br., at 8) is simply another example of plaintiff attempting to confuse the Court because it is undisputed that the Company's decision to investigate Wilson was not based on his abuse of his cell phone (which was first uncovered *by* the investigation), his excessive mileage, or "inaccurate" customer satisfaction surveys.

Rather, it is undisputed that Pezon and his supervisor requested that Security Services investigate Wilson because of their suspicions that Wilson was not accurately reporting his work activities (suspicions which were obviously well-founded). (Pezon Decl., ¶¶ 20, 22, Exh. H). These suspicions were based, in part, on the undisputed fact that customers and PPL

15

employees complained that Wilson was not performing his job duties *despite* the fact that Wilson continued to report high mileage on his expense report, and that customers in Wilson's service area (who he had claimed to have worked with) were returning customer surveys to Pezon claiming that they did not work with Wilson on particular projects. (Pezon Decl., ¶ 20). Pezon did not request that any other employee in his work group be investigated because he had received no complaints or survey forms indicating that Wilson's coworkers were not accurately reporting their work activities. (Pezon Decl., ¶¶ 13, 20).

Similarly, Wilson has presented no evidence that the Company requested a medical note from Wilson to substantiate an August 14, 2000 absence because of his race other than his wholly conclusory subjective belief that he "felt it was part of the conspiracy to retaliate against me." (Wilson Tr. 299). Rather, it is undisputed that the Company had the right to request medical notes from employees, and Pezon had in the past requested medical documentation from Wilson's co-workers.[10] (Pezon Tr. 173, 179-80). Moreover, even if the Company as a matter of practice did not request medical notes from all employees to substantiate all absences, Wilson was not similarly situated to the average PPL employee because a Company investigation had revealed by August 14, 2000 that he was conducting substantial personal business on Company time, and lying about his whereabouts, which led the Company to question the bona fides of his August 14th absence. (Geneczko Decl., ¶¶ 3-4).

Finally, even if Wilson was able to substantiate his conclusory allegations that he was subjected to harassment and disparate working conditions as a result of his race (which he

---

[10]    While Wilson claims that he did not request a doctor's note when he was a supervisor until the fifth sick day, Wilson supervised bargaining unit employees whose union contract set forth that requirement. As Pezon testified, no such practice or requirement applied to management employees. (Pezon Tr. 173).

cannot do), his harassment claim still must be dismissed because the alleged conduct he complains of was not "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." Harris v. Forklift Sys., 510 U.S. 17, 21 (1993). (Def. Mem., at 40).

## III. PLAINTIFF HAS FAILED TO ADDUCE ANY FACTS TO SUPPORT HIS RETALIATION CLAIMS.

As an initial matter, plaintiff cannot establish a prima facie case of retaliation because the record is devoid of any facts establishing a causal connection between the lawsuit he filed in 1988 and his termination in 2000. Shaner v. Synthes USA, 204 F.3d 494, 501 (3d Cir. 2000); Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997); Harris v. SmithKline Beecham, 27 F. Supp. 2d 569, 580 (E.D. Pa. 1998).

Indeed, Wilson presents not a single fact linking the decision by Robert Geneczko to terminate his employment in 2000 based on the investigation report to Wilson's protected activity in 1988 – activity which occurred when Wilson worked in a different department and involved a supervisor who had no involvement with Wilson since 1988 (and, indeed, was not even employed by the Company in 2000 when Wilson was terminated). (Wilson Tr. 27-29, 32, 34). In fact, Geneczko offered uncontroverted testimony that not only was Wilson's prior lawsuit irrelevant to the decision to terminate his employment, but also that he did not even have knowledge of the underlying facts and circumstances of that suit. (Geneczko Decl., ¶ 7).

Notwithstanding these undisputed facts, and the *twelve year* period between the protected conduct and the adverse action, Wilson argues that his retaliation claim must proceed to trial because he has "alleged a continuous course of discriminatory conduct extending from his

17

1988 lawsuit to his termination in 2000, by testifying that his performance evaluations after the lawsuit were persistently, and unfairly, negative." (Pl. Br., at 10).  Not only is such a conclusory allegation insufficient to withstand summary judgment, but this assertion is directly *contradicted* by Wilson's own deposition testimony in which he stated that between 1988 and 1997 (when he began reporting to Pezon) he had few complaints about the treatment he received at PPL. (Wilson Tr. 32-35).

Indeed, between 1988 and 1997, Wilson testified that he reported to Ed Kepkete, Mary Kirson and Bruce Keller.  Wilson admitted that he had no complaints about the treatment the he received from Kepkete and Keller (Wilson Tr. 33, 40), and that although he had issues with Kirson, he does not believe that Kirson discriminated against him because of his race or prior lawsuit.  (Wilson Tr. 34-37).  To the contrary, Wilson testified that all of the employees in Kirson's workgroup had problems with Kirson, who was a difficult supervisor. (Wilson Tr. 34-37).

Moreover, Wilson presents no concrete facts to support his wholly conclusory assertion that a "continuous course of discriminatory conduct" existed between 1988 and his termination in 2000.  Indeed, he testified that no one ever said anything to him that led him to believe that his 1988 lawsuit effected his subsequent performance evaluations.  (Wilson Tr. 332). Rather, his claim is entirely based on his unsubstantiated, conclusory subjective belief (and one which conflicts with his testimony that he had few complaints about his treatment between 1988 and 1997) that "my work performance was always being scrutinized based on the prior action that I had against the Company." (Wilson Tr. 331)  See Fireman's Ins. Co. v. Du Fresne, 676 F.2d 965, 969 (3d Cir. 1982) (party resisting summary judgment may not rely merely on bare assertions, conclusory allegations or suspicions); Tyler v. SEPTA, No. Civ. A. 99-4825, 2002

18

WL 31965896 (E.D. Pa. Nov. 8, 2002) (unsubstantiated allegations or arguments insufficient to defeat summary judgment).

Thus, Wilson's claim that a causal connection exists between his 1988 lawsuit and 2000 termination based on a "continuous course of discriminatory conduct" is absolute unsupported nonsense.

Finally, as discussed in defendant's initial brief (at 45-46), even if plaintiff can establish a prima facie case of retaliation, he has certainly not produced any evidence that PPL's legitimate non-discriminatory reasons for terminating him (theft of time, submission of a false expense report, etc.) were a pretext for unlawful retaliation. Rather, all Wilson offers in support of his claim is his subjective belief (unsupported by any facts) that his termination was connected to his 1988 lawsuit because of the Company's "general process of trying to prove incompetent, incapable of performing job duties." (Wilson Tr. 334) See Bedford v. SEPTA, 867 F. Supp. 288, 293-94 (E.D. Pa. 1994) (granting summary judgment where plaintiff only offered her "own theory" to support claim of retaliation).

## CONCLUSION

For the foregoing reasons, and the reasons stated in defendant's memorandum of law in support of its motion for summary judgment, defendant's motion for summary judgment should be granted in its entirety, and plaintiff's Complaint should be dismissed in its entirety.

Dated: New York, New York
October 16, 2003

PROSKAUER ROSE LLP

By: _____
      Bernard M. Plum
      Daniel R. Halem
      Peter P. Rahbar

1585 Broadway
New York, New York  10036
(212) 969-3000

Malcolm J. Gross (08137)
GROSS MCGLINLEY LABARRE
& EATON LLP
33 South Seventh Street
P.O. Box 4060
Allentown, Pennsylvania 18105-4060
(610) 820-5450

Attorneys for Defendant