IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LESLIE WILSON** : | |
| : | CIVIL ACTION |
| v. : | |
| : | NO. 02-CV-4662 |
| **PPL ELECTRIC UTILITIES CORP.** : | |

**MEMORANDUM AND ORDER**

**Kauffman, J.**                                                                                                          **March      , 2004**

Plaintiff Leslie Wilson ("Plaintiff") brings claims for damages and injunctive relief against PPL Electric Utilities Corp. ("Defendant") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") (Counts I, II, III, and VI), 42 U.S.C. § 1981 (Count IV), the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (the "ADEA") (Count V), and Pennsylvania tort law regarding intentional infliction of emotional distress (Count VII). Now before the Court is Defendant's Motion for Summary Judgment ("Motion"). For the reasons stated below, the Motion will be granted.

Plaintiff alleges that he was fired on account of his race, his age, and in retaliation for a race discrimination suit that he brought against Defendant twelve years prior to his termination. He also contends that he was subjected to racial and age-based harassment and that his employer should be held liable for intentional infliction of emotional distress. The Court has carefully considered Plaintiff's allegations and, on the basis of undisputed facts, concludes that he was terminated because of numerous complaints about his job performance, because he lied to his supervisor about his work activities, and because he submitted false expense reports. Judgment will be entered against Plaintiff because he has failed to raise a genuine issue of material fact

1

with regard to any of his claims.

I.   Factual Background

Plaintiff worked for Defendant for twenty-seven years prior to his termination in September of 2000. Compl. ¶¶ 7, 18. Immediately prior to his termination, he worked as a Service Consultant in the Field Service Department, facilitating communications between customers and engineers and selling new products and services. Motion at p. 4, Compl. ¶ 8. Service Consultants spend much of their time traveling by car to meet with customers and potential customers in the field. Pezon Declaration ¶ 5. Plaintiff's supervisor oversaw only three other employees in addition to Plaintiff, two of whom were Service Consultants. Id. ¶ 2. Plaintiff was the only African-American employee in a small department and was over the age of 40 at the time of his termination. Plaintiff's Brief in Opposition to Defendant's Motion ("Pl. Resp.") at p. 1.

Plaintiff's supervisor from approximately 1997 until his termination was Ron Pezon. Motion at p. 5. Pezon received multiple complaints about Plaintiff's work from both supervisors within the company and customers. Pezon Declaration ¶¶ 6-9. One supervisor gave Pezon a list of customer complaints related to Plaintiff's poor management of his work projects. Pezon Declaration ¶ 6. Another supervisor complained that other employees found it necessary to perform Plaintiff's duties for him in order to be able to complete their own work. Id. ¶ 8. One major customer complained that Plaintiff's failure to respond to his letters and phone calls resulted in a three-month delay on his building project. Id. ¶ 7, Ex. A. The local manager for another major customer complained to Pezon's supervisor that Plaintiff failed to return phone

calls or respond to requests and neglected to inform the customer of an anticipated installation delay. Id. ¶ 9. Pezon received additional complaints about Plaintiff on customer satisfaction survey forms. Id. ¶ 12-13, Ex. D. Pezon did not receive significant complaints from customers about the other two Service Consultants under his supervision. Id. ¶ 13.

Starting in 1998, Pezon began to supervise Plaintiff's job performance more carefully. Id. ¶ 14. He required Plaintiff to provide weekly plans listing meetings, appointments, and major objectives. Id. ¶ 15, Ex. E. Pezon grew increasingly suspicious that Plaintiff was neither fulfilling his duties in general nor following the agreed upon weekly plans. In particular, although Plaintiff stated on his plans that he traveled to the Buxmont customer almost every day in August 1999, one of Defendant's Buxmont supervisors complained that Plaintiff was providing inadequate service. Pezon Declaration ¶ 17.

After discussions with his own supervisor, Pezon arranged for Defendant's Security Services to determine whether Plaintiff was conducting non-company business during the work day. Pezon Declaration ¶¶ 21-22. The investigation included hiring an outside company to conduct surveillance of Plaintiff on six different days in June. Rehrer Declaration ¶ 6. Surveillance revealed that Plaintiff did not attend many of the planned appointments for those days and nevertheless claimed mileage reimbursement. Id. ¶¶ 9-10. On several occasions, he left his house later than planned, arrived late to work, and conducted personal errands. Id. Ex. B. Plaintiff does not deny the discrepancies between his weekly plans, his expense reports, and his actual work activities. Wilson Dep. at pp. 196-98. After Security Services issued its final report on the investigation, Robert Geneczko, the Vice President of Plaintiff's department,

terminated his employment. Geneczko Declaration ¶¶ 5-7.[1]

A caucasian Service Consultant named James Stouch was investigated at approximately the same time as Plaintiff on the basis of similar misconduct allegations. Rehrer Declaration Ex. I, Geneczko Declaration at ¶ 8. Stouch's supervisors requested the investigation in response to allegations that he was running personal errands during the work day. Rehrer Declaration Ex. I. Surveillance of Stouch's activities confirmed the allegations. Id. Geneczko decided on the basis of the investigation to terminate Stouch. However, Stouch resigned before he was officially terminated. Id. ¶ 21.

II.    Legal Standard

In deciding a motion for summary judgment pursuant to Fed. R. Civ. P. 56, the test is "whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." Medical Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999) (quoting Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994)). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must examine the evidence in the light most favorable to the non-moving party and resolve all reasonable inferences in that party's favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "there

---

[1] The investigation also determined that Plaintiff made numerous personal phone calls from his company cell phone, costing the company $1,026. Motion at p. 16. Plaintiff does not dispute this allegation. Pl. Resp. at p. 7.

can be 'no genuine issue as to any material fact' . . . [where the non-moving party's] complete failure of proof concerning an essential element of [its] case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

III.    Analysis

A.    Disparate Treatment, § 1981, and ADEA Claims (Counts I, IV and V)

The Title VII disparate treatment claim, the § 1981 claim, and the ADEA claim must be analyzed under the burden-shifting framework developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000) (McDonnell Douglas analysis applied to ADEA claim); O'Brien v. City of Philadelphia, 837 F. Supp. 692, 699 (E.D. Pa. 1993) ("[g]enerally, the legal elements of a Section 1981 claim are identical to those of a Title VII disparate treatment claim, and, therefore, analysis under one theory is usually determinative of the other claim"). Under McDonnell Douglas, a plaintiff must present a prima facie case by demonstrating: (1) that he belongs to the protected group; (2) that he was qualified for the job; (3) that he was terminated in spite of his qualifications, and (4) that the circumstances of his termination would lead to an inference of unlawful discrimination. McDonnell Douglas, 411 U.S. at 802; Jones v. School District of Philadelphia, 19 F. Supp. 2d 414, 418 (E.D. Pa 1998). Once the plaintiff has made out a prima facie case, then the burden shifts to the defendant to set forth a legitimate, nondiscriminatory reason for the personnel action. McDonnell Douglas, 411 U.S. at 802. Finally, the plaintiff bears the burden of showing that the

articulated reason for the action was merely pretextual.  Id. at 802-3.[2]

The Third Circuit has elaborated on the standard that a plaintiff must meet to survive summary judgment under McDonnell Douglas.  If the plaintiff has made out a prima facie case, and the defendant has countered with a legitimate, nondiscriminatory reason, "plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  In other words, a plaintiff may survive summary judgment by either "(i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  Id.  The evidence "must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action."  Id.

Assuming arguendo that Plaintiff has set forth a prima facie case, no rational juror could

---

[2] Title VII claims are considered under either a pretext analysis or a mixed motives analysis.  See Watson v. Southeastern Pa. Transportation Authority, 207 F.3d 207, 220 (3d Cir. 2000).  In a pretext case, the plaintiff must show that consideration of an impermissible factor was determinative in the employment decision.  Id. at 215.  In a mixed-motives case, the employer will be held liable if it was motivated by an illegitimate factor, but the plaintiff's remedies are limited if the employer can show that it would have taken the same action in the absence of the illegitimate factor.  Id. at 216-17.  The mixed-motive analysis applies when the plaintiff presents "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race . . . was a motivating factor for any employment practice."  Desert Palace, Inc. v. Costa, 123 S. Ct. 2148, 2155 (2003) (internal quotations omitted).
  Both parties have asked the Court to apply the standard for pretext cases.  See Motion at pp. 20-21; Pl. Resp. at pp. 4-5.  Accordingly, this will be treated as a pretext case.

conclude that Defendant's proffered reasons for the termination are merely pretextual. Numerous customers and employees complained about Plaintiff's failure to complete his work duties sufficiently. Pezon received no comparable complaints about the other employees in the department. When Pezon followed up on the complaints by requiring Plaintiff to submit a weekly work plan, Plaintiff submitted a plan at the beginning of the week as required, but then failed to adhere to the established schedule. Moreover, he lied on his expense reports about his failure to complete the scheduled tasks and sought mileage reimbursement for trips that were not taken. Even if, as Plaintiff alleges, he eventually took some of these trips on different dates, his failure to complete his work as instructed by his employer and then misrepresenting his activities and expenses gave Defendant indisputable grounds for terminating his employment. No reasonable fact finder could reject the employer's articulated reasons based on undisputed facts. Nor could a reasonable fact finder believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Defendant's actions. Accordingly, the Motion for Summary Judgment will be granted with respect to Counts I, IV, and V.

B.      Disparate Impact Claim (Count II)

To establish a prima facie case of disparate impact, a plaintiff must demonstrate "that application of a facially neutral standard has resulted in a significantly discriminatory hiring pattern." Lanning v. Southeastern Pa. Transit Authority, 181 F.3d 478, 485 (3d Cir. 1999); see also O'Brien v. City of Philadelphia, 837 F. Supp. 692, 698 (E.D. Pa. 1993). Then "the burden shifts to the employer to show that the employment practice is job related for the position in question and consistent with business necessity." Lanning, 181 F.3d at 485 (citations omitted).

Finally, if the employer meets its burden, "the plaintiffs may still prevail if they can show that an alternative employment practice has a less disparate impact and would also serve the employer's legitimate business interest." Id.

The Complaint alleges that Defendant's Standards of Conduct and Integrity and its policies regarding excused absences, sick leave, and investigation of employee misconduct have a significant discriminatory impact on a protected class. Compl. ¶ 43-48.[3]  Plaintiff, however, has provided no evidence to substantiate these allegations aside from the fact that he was terminated and that he was the only African-American in his small department.  This evidence is insufficient to demonstrate the existence of a significantly discriminatory hiring pattern.  In fact, during his deposition, Plaintiff said that he was not alleging discriminatory practices with respect to any employees other than himself.  Wilson Dep. at pp. 346-47.  Accordingly, Defendant is entitled to judgment as a matter of law on this claim.

C.    Retaliation Claim (Count III)

Plaintiff alleges that he was fired because he brought a race discrimination claim against Defendant in 1988, twelve years prior to his termination.  Pl. Resp. at p. 10.  To prove his retaliation claim, Plaintiff must demonstrate that he engaged in protected activity, that the employer took adverse action against him, and that there is a causal link between the protected activity and the adverse action.  Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 177 (3d

---

[3]    On August 14, 2000, during the Security Services investigation, Plaintiff told his supervisor that he was unable to come to work that morning because he had a doctor's appointment.  Pezon Declaration ¶ 23.  When he refused his employer's request to provide a doctor's note, he was suspended pending the outcome of Defendant's investigation into his job performance.  Geneczko Declaration ¶ 4.

Cir. 1997). To succeed on a motion for summary judgment, Defendant "must show that the trier of fact could not conclude, as a matter of law, (1) that retaliatory animus played a role in the employer's decisionmaking process and (2) that it had a determinative effect on the outcome of that process." Krouse v. American Sterilizer Co., 126 F.3d 494, 501 (3d Cir. 1997). Judgment will be granted for Defendant if it offers a legitimate non-retaliatory reason for the adverse employment action and if Plaintiff is unable to raise a genuine issue of material fact on the question of whether the legitimate reason is a pretext for retaliation. Id.

As explained above, Defendant has presented an indisputable and compelling case for terminating Plaintiff's employment on the basis of legitimate, non-discriminatory reasons, and Plaintiff has failed to raise a genuine issue of material fact. Moreover, Plaintiff's claim that he was terminated in retaliation for events occurring twelve years earlier is completely unfounded. Accordingly, retaliatory animus could not have had a determinative effect on the outcome and the Motion will be granted with respect to Count III.

D.      Harassment (Count VI)

To determine whether Plaintiff has a Title VII claim for a hostile or harassing work environment, the Court must look:

> . . . at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

Harris v. Forklift Systems, 510 U.S. 17, 23 (1993). Plaintiff must demonstrate five elements: (1)

that he suffered intentional discrimination because of his membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected him; (4) the discrimination would have detrimentally affected a reasonable person of the same protected class; and (5) respondeat superior liability. West v. Philadelphia Electric Co., 45 F.3d 744, 753 (3d Cir. 1995). The acts must continue over time, and "isolated or single incidents of harassment are insufficient to constitute a hostile environment." Id. at 755.

The evidence presented by Plaintiff does not rise to the level necessary to demonstrate a hostile work environment. The majority of the actions that he cites were taken for legitimate business purposes and cannot be construed as discriminatory in any way. Pezon required Plaintiff to submit weekly work plans in response to multiple complaints that he was not completing his work.[4] The investigation into Plaintiff's activities also was conducted in response to specific complaints about his work habits. Given the significance of the complaints and the fact that Plaintiff conducted most of his work activities in the field, surveillance was necessary and appropriate to determine why Plaintiff's productivity was so low. A similar investigation of a caucasian employee was conducted at approximately the same time, resulting in a decision to terminate that employee.

Plaintiff also alleges that requiring him to provide a doctor's letter to substantiate a half-day's absence from work was harassment. However, at the time that Defendant asked for the letter, surveillance had revealed that Plaintiff frequently neglected his work duties to conduct personal business on company time. No reasonable juror could conclude that, in light of the

---

[4] Plaintiff stated in his deposition that although he thought that Pezon was setting him up to fail, he did not know whether the weekly plan requirement was imposed because of his race. Wilson Dep. at 113-14.

results of the investigation, Defendant's insistence on receiving a doctor's note constituted racial discrimination.

Plaintiff testified at his deposition that two different supervisors commented on his age on separate occasions several years apart. Wilson Dep. at pp. 37, 312. At his deposition, however, Plaintiff could not identify any additional comments demonstrating animus toward older employees. Wilson Dep. I at p. 329. Because "isolated or single incidents of harassment are insufficient to constitute a hostile environment," and because the comments were not connected in either time or content, they are insufficient to support a claim of age-based harassment. West v. Philadelphia Electric Co., 45 F.3d 744, 755 (3d Cir. 1995).

Plaintiff also states that his coworkers insulted him by calling him "Boy" and "Rev."[5] While these comments undoubtedly were offensive, they were made by colleagues rather than supervisors. There is no evidence that Plaintiff ever complained about them to a supervisor. In fact, Plaintiff has presented no evidence showing that Defendant knew or should have known about the comments. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 759 (1998).[6]

---

[5] Plaintiff said in his deposition that he was insulted when his coworkers referred to him as "Rev," but he also stated that the comments were made "[b]ecause of my position as a reverend" at the St. James Zion Church. Wilson Dep. at pp. 42, 211.

[6] Nor has Plaintiff alleged that Defendant is liable because the employees acted either in the scope of their employment or with apparent authority. See Burlington Industries, Inc., 524 U.S. at 758-59; Dougherty v. Henderson, 155 F. Supp. 2d 269, 280 (E.D. Pa. 2001).

At Oral Argument on the Motion, Plaintiff's counsel suggested that Plaintiff's supervisors should have been aware of these comments because their offices were located in close proximity to where Plaintiff worked. See Transcript of Oral Argument on Motion, March 22, 2004, at p. 54, lines 13-18. The only evidence on the record to support this allegation is Plaintiff's deposition testimony that one of his supervisors had an office that was "right outside" of where Plaintiff worked so that Plaintiff could hear his colleagues "laugh[ing] and jok[ing]" . . . in his office." Wilson Dep. p. 327. The contention that Plaintiff could hear laughing and joking in his

Accordingly, he has failed to show the existence of respondeat superior liability with respect to the offensive comments.

Because Plaintiff's allegations do not support a claim for racial or age-based harassment, judgment will be granted in Defendant's favor on Count VI.

E.   Intentional Infliction of Emotional Distress (Count VII)

Finally, Count VII brings a claim for intentional infliction of emotional distress, stating that Plaintiff suffered stress, anxiety and depression as a consequence of Defendant's actions. Because Pennsylvania's workers' compensation statute provides the sole remedy for injuries incurred during the course of employment, claims for intentional infliction of emotional distress are generally barred under Pennsylvania law. Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 940 (3d Cir. 1997). An exception will be made if "the attack was motivated by personal reasons, as opposed to generalized contempt or hatred, and was sufficiently unrelated to the work situation so as not to arise out of the employment relationship." Fugarino v. University Services, 123 F. Supp. 2d 838, 844 (E.D. Pa. 2000).

The incidents alleged by Plaintiff clearly fell within the employment relationship. All occurred either at his workplace or during the working day when he should have been driving to and from work-related appointments. He has not alleged facts suggesting that any of his supervisors were motivated by personal animus towards him. Accordingly, his claim for intentional infliction of emotional distress is barred, and judgment will be granted for Defendant

---

supervisor's office is insufficient to raise a genuine issue of material fact as to whether his supervisors knew or should have known about the racially offensive comments.

on Count VII.[7]

IV.    Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment.  An appropriate Order follows.

---

[7] Even if Count VII were not barred by the workers' compensation statute, the conduct that Plaintiff describes fails to rise to the level necessary to bring a claim for intentional infliction of emotional distress under Pennsylvania law.  "Only if conduct which is extreme or clearly outrageous is established will a claim be proven . . . . '[T]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society.'" Hoy v. Angelone, 720 A.2d 745, 754 (Pa. 1998) (quoting Buczek v. First National Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)).  See also Barbosa v. Tribune Co., No. 01-CV-1262, 2003 WL 22238984 (E.D.Pa. Sept. 25, 2003) (no claim for intentional infliction of emotional distress where coworkers used racial epithets); EEOC v. Chestnut Hill Hospital, 874 F. Supp. 92, 96 (E.D. Pa. 1995) (racial harassment alone does not state a claim for intentional infliction of emotional distress).

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LESLIE WILSON : | |
| : | CIVIL ACTION |
| v. : | |
| : | NO. 02-CV-4662 |
| PPL ELECTRIC UTILITIES CORP. : | |

### ORDER

**AND NOW**, this _____ day of March, 2004, upon consideration of Defendant's Motion for Summary Judgment (docket no. 14), Plaintiff's response thereto (docket no. 17), Defendant's Reply Memorandum (docket no. 19), and the Hearing of March 22, 2003, and for the reasons stated in the accompanying Memorandum, it is **ORDERED** that the Defendant's Motion for Summary Judgment is **GRANTED** in favor of Defendant and against Plaintiff. The Clerk of the Court shall mark this case closed for statistical purposes.

BY THE COURT:

_____
**BRUCE W. KAUFFMAN, J.**